UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
FRESH MEADOWS FOOD SERVICES, LLC
and THOMAS J. CLARKE,

               Plaintiffs,                       **OPINION AND ORDER**
                                                                   04-CV-4767 (NG)(RLM)

  - against -

RB 175 CORP., RAPHY BENAIM and TOVIT
BENAIM,

               Defendants.
------------------------------------------------------------------x
GERSHON, United States District Judge:

        Defendants RB 175 Corp. ("RB 175") and Raphy and Tovit Benaim (jointly the "Benaims") own and lease several real estate properties, principally in the County of Queens, New York. At issue in this case is the property located at 175-14 Horace Harding Expressway, Fresh Meadows, New York (the "Premises") which for many years had been operated as either a gasoline station or an auto repair center. On March 21, 2001, the Benaims leased the Premises to plaintiff Thomas Clarke, who subsequently subleased it to plaintiff Fresh Meadows Food Services, LLC ("Fresh Meadows") for the purpose of operating a fast food restaurant chain. Amended Complaint, Ex. C. Upon excavating the premises, Clarke discovered the existence of underground gasoline storage tanks ("USTs"), which he believed were previously removed on November 7, 1989. The removal of the tanks and the resulting soil contamination cost Clarke and Fresh Meadows in excess of $160,000 to remedy, $100,000 of which was reimbursed by the Benaims under the terms of the lease.

        In the Amended Complaint, Clarke claims that the Benaims' actions prior to entering into the lease, as well as during the negotiations of the lease, entitle him to damages pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961 *et seq.* Plaintiffs

also bring various supplemental state law claims (Counts Two through Six). RB 175 and the Benaims have moved to dismiss the Amended Complaint in its entirety. For the reasons discussed below, defendants' motion is granted.

## FACTS

The allegations in the Amended Complaint, described below, are taken as true for the purposes of defendants' motion to dismiss:

From approximately 1968 to 1988, the Benaims, either as lessees or through various subtenants and/or entities that they controlled, operated a gasoline station on the Premises. In or around 1987 or 1988, they leased the Premises to a company that, for a short time, additionally operated a "facility that lubricated motor vehicles and changed the oil used by them." Amended Complaint ¶ 19. During this period, four above-ground gasoline pumps were removed from the Premises. By an indenture dated August 26, 1988, the Benaims purchased fee simple absolute to the Premises from the then-owner, and obtained physical possession of the property in or around 1989.

Upon obtaining physical possession of the Premises, the Benaims discovered that the gasoline station had been operating in violation of the terms and provisions of the New York City Zoning Ordinance. Specifically, a variance, which the New York City Board of Standards and Appeals ("BSA") originally issued in 1931, had expired and not been renewed by the previous owner. It is unclear when the variance had expired; however, in 1991, Raphy submitted an application to the BSA to extend the renewal. Additionally, Raphy had to retroactively legalize an addition that was made to the gas station without the BSA's prior approval.

The BSA application process required Raphy to appear before Community Board #8 (the

"Community Board"), to answer questions regarding the Premises. Specifically, the Community Board questioned him about the removal of four gasoline pumps and the status of the USTs. In response to the Community Board Member's questions, plaintiffs allege that Raphy stated that:

> (i) the gas tanks were removed, (ii) everything was [supervised] by the fire department, (iii) it [the removal of the pumps and tanks] was done by the previous people before me, (iv) I gave the lease to somebody. They did from the place fast lube and they removed the tanks. They removed the pumps. They did it on their own without me.

Amended Complaint ¶ 38.

Plaintiffs allege that, at the time of the hearing, Raphy knew that, at least some of the USTs remained in place and that he fraudulently misrepresented this fact to the Community Board in order to induce the Community Board to approve the application for the extension of the variance and retroactive legalization of the gasoline station addition.

In or around 1997, Raphy hired Camin Cargo Control, Inc., ("Camin") and Soil Mechanics Environmental Services, Inc. ("Soil") to prepare an environmental report "to determine if the previously removed underground gasoline storage tanks had any impact on the surrounding soils." Amended Complaint, Ex. A at 4. At a state court deposition in 2004, Raphy stated that he commissioned Camin to prepare the report in order to solict an oil company to open up a gasoline and service station on the Premises. Amended Complaint ¶ 43. Camin and Soil's investigation included site visits, during which they extracted soil samples from the ground. Plaintiffs assert that Raphy faxed Camin an affidavit which stated that, "on November 7, 1989, Trinity Petroleum Systems, Inc. . . . removed eleven (11) underground or tanks from [the Premises] . . . 10-550 gallon, single wall steel tanks and 1-4000 gallon all steel tank." Amended Complaint ¶ 46. Plaintiffs claim that the affidavit, which was on Trinity's letterhead and signed by Reed Turoff, was actually created by or at the direction of Raphy, and contained information that Raphy knew was false.

3

Upon completion of the environmental study, Camin issued a Tank Closure Report (the "Report"), in which it summarized its findings. With respect to the UST removal, Camin reported that:

> Tank removal operations were initiated and completed on November 7, 1989, by Trinity Petroleum Systems, a tank Contractor experienced in the removal of underground storage tanks. The tanks had been pumped empty, vented and squeegee cleaned. Subsequently, the interior and exterior of the tanks were visually inspected for holes, cracks and other signs of structural instability. There were no signs of any structural damage to the tanks nor any indications of soil contamination such as soil staining or odors. All tanks were removed to a salvage yard for disposal . . . . Amended Complaint ¶ 46.

Plaintiffs contend that Camin relied on the Trinity affidavit, as well as other misrepresentations made by Raphy in making this finding. In particular, Clarke claims that, during the site investigation, Raphy directed Camin to specific areas for testing, under the guise of avoiding interfering with utility lines. Although plaintiffs do not allege that utility lines did not, in fact, exist, they imply that, had Raphy not directed the testing, the remaining USTs would have been discovered then, rather than later as discussed below.

Camin concluded that:

> on the basis of the on site investigation as well as the laboratory analyses, there is no evidence of contamination originating from the previously existing underground gasoline storage tanks. There was no structural damage to the tanks and all concentrations of volatile organic compounds from the samples collected around the previous tank fields were not detected . . . Amended Complaint ¶ 47.

After failed attempts to finalize a lease with an oil company for the Premises, Raphy entered negotiations with Clarke, who intended to use the property to build and operate a fast food chain restaurant. Raphy informed Clarke that the USTs had been removed and that no contamination existed at the site. He provided Clarke with a copy of the Report for his review. After exchanging drafts between counsel, the Benaims and Clarke executed the lease on March 21, 2001. Article 11

4

of the Lease, contains the following provision:

> Landlord represents that it has no knowledge of the presence of 'hazardous material' on or beneath the Premises.
>
> (1) Annexed hereto as Exhibit C and made a part hereof is a Phase 1 Environmental Study obtained by the Landlord by Camin Control Inc. dated June 19, 1997 stating no remediation was necessary at the premises at that time. Landlord's representation is based upon said study and Landlord has not received any notices or has any knowledge of the existence of any hazardous material at the premises.

Shortly thereafter, Clarke excavated the premises and discovered a total of six 550-gallon USTs and one 4,000 gallon UST, located where the Report indicated that they were removed, as well as soil contamination. Clarke and Fresh Meadows spent over $160,000 to remove the USTs and to remediate the contamination. Plaintiffs have received a $100,000 rent credit toward remediation as provided in the lease.[1] Clarke asserts that, at the time the lease was executed, the Benaims, in particular Raphy, knew that, despite all representations to the contrary, all of the USTs had not been removed and that the soil contained contamination.

Finally, the Amended Complaint alleges that, as a result of the soil contamination, the Benaims are under investigation by the New York State Department of Environmental Conservation ("DEC") and the New York State Environmental Protection and Spill Compensation Fund (the "Spill Fund"). It further alleges that Raphy will claim a lack of responsibility for the contamination on the ground that he thought it had been remedied.

---

[1] Article 11 provides that, if contamination were found during construction or excavation of the Premises, ". . . Landlord's liability for such remediation shall be limited to the lesser of the sum of One Hundred Thousand and XX/100 Dollars ($100,000.00) or the actual sum necessary to remediate the condition less whatever costs Tenant would reasonably incur to excavate the site." Amended Complaint, Ex. C at 30. The lease also provides that if "the cost of [remediation] exceeds the sum of One Hundred Thousand and XX/100 Dollars ($100,000.00). . . Tenant shall have the option of terminating this Lease and receiving refund of all monies paid by Tenant to Landlord hereunder." *Id.*

**DISCUSSION**

Defendants move to dismiss the Amended Complaint for failure to state a claim for which relief can be granted. However, as defendants have answered, the motion is converted to a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. In addition, since the grounds for dismissal raise issues as to the court's jurisdiction, I note that a court may, under Rule 12(h)(3) of the Federal Rules of Civil Procedure, dismiss an action *sua sponte* "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter."

A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss. *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir. 1999). That is, the motion should be granted only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d. Cir. 1998). Plaintiffs' factual allegations must be accepted as true, *Zinermon v. Burch*, 494 U.S. 113, 118 (1990), and the court must draw all inferences in favor of plaintiffs. *Thomas v. City of New York,* 143 F.3d. 31, 37 (2d Cir. 1998).

In Count One of the Amended Complaint, plaintiffs assert a violation of 18 U.S.C. § 1962(c), which makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. RICO's definition of "racketeering activity" includes "any act which is indictable under" 18 U.S.C. §§ 1343 (wire fraud) or 1341 (mail fraud). *See* 18 U.S.C. § 1961(1)(b). Under the mail and wire fraud statutes, "any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," which involves use of the mails or wire

is indictable. *See* 18 U.S.C. §§ 1341, 1343. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *See* 18 U.S.C. § 1961(4). At least two acts of racketeering activity are required to establish a RICO pattern. *See* 18 U.S.C. § 1961(5). While RICO requires only a minimum of two predicate acts, plaintiffs must also show that the two acts are (1) related and that (2) they amount to, or pose a threat of, continuing criminal activity. *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997); *United States v. Indelicato*, 865 F.2d 1370, 1381 (2d Cir. 1989), *cert. denied,* 493 U.S. 811 (1989). Continuity is recognized as "both a closed– and open-ended concept." *H.J. Inc., v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989). Thus, plaintiffs must allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time). *See id.* Plaintiffs allege that, from approximately 1993 to 2001, through an enterprise operating for the purposes of leasing, potentially selling, developing, and operating commercial properties, defendant Raphy implemented a scheme to "demise the Premises without disclosing the environmental situation." Amended Complaint ¶ 92. Plaintiffs further allege that Clarke signed the lease of the Premises as a result of Raphy's misrepresentations and that plaintiffs were thereby damaged. Amended Complaint ¶¶ 111-113.

Defendants challenge the sufficiency of plaintiffs' RICO claim on a variety of grounds including failure to adequately allege a RICO pattern. Since that ground requires dismissal, the other grounds will not be addressed.

Plaintiffs identify two predicate acts of mail and wire fraud allegedly committed in

furtherance of the scheme to demise the Premises: (1) the August 8, 1997 transmission of the allegedly fraudulent Trinity Affidavit by Raphy, or someone acting on his behalf, from New York, to Camin's office in New Jersey; and (2) the mailings of the negotiated drafts of the lease between counsel via the United Parcel Service in January of 2001. These acts are insufficient to establish either open- or closed-ended continuity as required for pleading a RICO pattern.

### Open-ended continuity

Open-ended continuity requires an assessment of "the nature of the RICO enterprise, and of the predicate acts." *Cofacredit S.A v. Windsor Plumbing Supply Co.,* 187 F.3d 229 at 242 (2d Cir. 1999). Where, as here, defendants are operating a legitimate business, plaintiffs, to show open-ended continuity, are required to plead facts indicating that there existed the threat of continued criminal activity in furtherance of defendants' plans. *See GICC Capital Corp. v. Technology Finance Group,* 67 F.3d 463, 466 (2d Cir. 1995). In this case, plaintiffs allege that, because the Benaims are disclaiming all responsibility for the environmental contamination, and will likely continue to do so in future proceedings before the DEC and the Spill Fund, the fraudulent activity (the misrepresentations regarding the tanks) will continue. However, it cannot be inferred from the Amended Complaint that this threat exists. The fraud alleged is simply Raphy's misrepresentation to the defendants that all of the USTs had been removed. Raphy's act of misrepresenting the true facts, regardless of how the misrepresentation was ultimately replicated, was "inherently terminable" and presents no threat of continued criminal activity. *See Cosmos Forms Ltd. v. Goldfinger*, 113 F. 3d 309 (2d Cir. 1997). As a practical matter, once the site was excavated and the remaining USTs and soil contamination were discovered and remedied, there could be no continuation of the fraudulent scheme to demise the Premises, as the Premises are now clear of all

8

USTs and contamination. Plaintiffs do not allege any fraudulent activities in connection with defendants' other properties. Therefore, the open-ended continuity requirement is not met. *See Marcoux v. American Airlines, Inc.,* No. 04-CV-1376, No. 03-CV-4987, 04-CV-0634, 2006 WL 842888, at *12 (E.D.N.Y Mar. 28, 2006); *see also Kadouri v. Fox,* No. 03-CV-1725, 2005 WL 783255, at *6 (E.D.N.Y. Jan. 24, 2005).

Plaintiffs' allegations that defendant Raphy will likely misrepresent his responsibility for the environmental contamination during a governmental investigation is speculative. Even if it were not, it is insufficient to create a RICO pattern. Rather, plaintiffs are simply attempting to improperly expand a single scheme directed against them, which scheme has now ended, by alleging that Raphy will deny his misrepresentations in the future. Such a claim is insufficient to meet the RICO pattern requirements. *See Schlaifer Nance & Co.*, 119 F.3d at 98.

### **Closed-ended continuity**

Plaintiffs also do not meet RICO's closed-ended continuity requirements. Closed-ended continuity is demonstrated by a "series of related predicates extending over a substantial period of time" *Cofacredit S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d at 242. The Second Circuit generally requires a showing that the alleged racketeering activity lasted for over two years. *See GICC Capital Corp.,* 67 F.3d at 466. While plaintiffs allege two predicate acts, several years apart, these allegations are insufficient to establish a closed-ended pattern of racketeering activity. Looking to other factors, such as the "number and variety of [predicate] acts, the number of participants, the number of victims, and the presence of separate schemes," *id.* at 467, weighs against a finding of closed-ended continuity here.

Plaintiffs have alleged neither a great number or variety of predicate acts. The predicate acts alleged are only the 1997 wire fraud and the 2001 mail fraud. Nor have they alleged the presence

9

of separate schemes. The only victim is plaintiff Clarke, as he is the sole party to the lease. Even were the court to recognize plaintiff Fresh Meadows, the sublessee of the Premises, as a victim of the alleged scheme, Clarke's and Fresh Meadows' interests are conjoined, as they were simultaneously injured by the same activity, namely, Raphy's misrepresentation that all of the USTs were removed when in fact they were not. *See Kadouri*, at *3. Even counting Raphy and Tovit Benaim as two participants in the scheme does not help plaintiffs' position, as the Benaims interests are also conjoined.

In sum, plaintiffs have not alleged a RICO pattern, and their RICO claim is dismissed.

## CONCLUSION

For the reasons discussed above, the defendants' motion to dismiss the Amended Complaint is granted. Count One of the Amended Complaint, the RICO count, is dismissed. As the only federal claim is dismissed, the court declines to exercise supplemental jurisdiction over the remaining state law claims, and those claims are dismissed without prejudice. The Clerk of Court is directed to enter judgment consistent with this opinion.

SO ORDERED.

*/s/ Nina Gershon*
**NINA GERSHON**
**United States District Judge**

Dated: September 25, 2006
Brooklyn, New York