UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
Fresh Meadow Food Services, LLC et al.,

|  |  |  |
|---|---|---|
|  | Plaintiffs, | **MEMORANDUM RULING AND ORDER** |
| -against- |  | Case No. 04-cv-4767 (TLM) |

RB 175 Corp. et al.,

                                        Defendants
-------------------------------------------------------------X

This case is before the Court on remand from the United States Court of Appeals for the Second Circuit. 2012 WL 5576679 (2d Cir. 2012) [Rec. Doc. 149, at 2].  The Circuit Court's Summary Order affirmed in part and vacated in part the Court's October 19, 2010 Judgment [Rec. Doc. 114] and the Court's February 2, 2011 Order [Rec. Doc. 144].  On remand, the Second Circuit restored jurisdiction for the limited purpose of "(1) mak[ing] a finding regarding the fraud claim in accordance with this order; (2) award[ing] $100,000 on the Navigation Law claim if the district court does not find sufficient evidence existing in the record to support the fraud claim; and (3) consider[ing] the issue of post-judgment interest." [Rec. Doc. 149, at 5].  The Circuit Court's Summary Order prohibited the Court from taking any action "other than those specified." [Rec. Doc. 149, at 5].  For the reasons set forth below, the Court will reinstate the plaintiffs' fraud award and the Court will award post-judgment interest to plaintiffs.

## I.  PROCEDURAL HISTORY

The plaintiffs filed suit in 2004 alleging a series of claims stemming from a lease agreement (the Lease) signed by the parties in 2001 for a property located at 175-14 Horace Harding Expressway in Queens, New York (the Site).  The matter was tried to the Court from

September 14 through September 20, 2010. On October 19, 2010, the Court issued an oral

ruling[1] and entered Judgment in favor of the plaintiffs, Fresh Meadow Food Services, LLC (Fresh

Meadow) and Thomas Clarke (Clarke), on Count 2 (New York Navigation Law), Count 3

(common law fraud), and Count 4 (breach of lease agreement) of the Amended Complaint.

*Judgment* [Rec. Doc. 114]. The Court entered Judgment in favor of the defendants, RB 175, Inc.

(RB 175), Raphy Benaim (Raphy), and Tovit Benaim (Tovit) on Count 1 (civil RICO) and Count

5 (fraudulent conveyance under New York Debtor and Creditor Law). [Rec. Doc. 114].

The Court specified that judgment be entered in the amount of $170,525.00 on Count 3

(common law fraud) and in the amount of $165,822.00 on Count 4 (breach of lease agreement);

the Court did not specify a separate award on Count 2 (New York Navigation Law), as that count

was subsumed by Count 3. The Court also awarded the plaintiffs the accrued pre-judgment

interest on the amounts awarded on Count 3 (common law fraud) and Count 4 (breach of lease

agreement). Additionally, the Court ordered that "post-judgment interest on the total award of

$335,347.00 plus accrued interest through the date of entry of this judgment, shall accrue at the

rate provided for by Title 28, United States Code, § 1961, from the date of entry of judgment

until paid." [Rec. Doc. 114].[2] Following the entry of judgment, the Court denied plaintiffs' post-

trial Motion to Alter Judgment [Rec. Doc. 142] because the parties' filing of notices of appeal

had divested the Court of "control over those aspects of the case involved in the appeal." *Order*

[Rec. Doc. 144] (citing Second Circuit precedent).

---

[1] The transcript of the October 19, 2010 proceedings includes the Court's oral ruling. [Rec. Doc. 147].

[2] Due to a mathematical error, the amount awarded by the October 19, 2010 Judgment was $335,347.00.
The correct amount of the award should have been $336,347.00.

Both the plaintiffs and the defendants appealed the Court's Judgment. [Rec. Doc. 122, 131].[3] The Circuit Court's Summary Order affirmed the entry of judgment in favor of the defendants dismissing Count 1 (civil RICO). [Rec. Doc. 149, at 3]. The Summary Order also affirmed the entry of judgment in favor of the plaintiffs on Count 2 (New York Navigation Law) and Count 4 (breach of lease agreement). [Rec. Doc. 149, at 3]. On Count 3 (common law fraud), the Circuit Court held that the Court clearly erred in its factual findings, vacated judgment and remanded the count to this Court for reconsideration. [Rec. Doc. 149, at 3]. On remand, the Court was instructed that if it found sufficient evidence, based on the existing trial record, to sustain the common law fraud claim, it was to reinstate the award for the fraud claim. [Rec. Doc. 149, at 4]. However, if the Court on remand found the evidence insufficient to reinstate the fraud award, the Court was instructed to dismiss the fraud claim and enter judgment in favor of the plaintiffs on Count 2, the Navigation Law claim, in the sum of $100,000.00.[4] Finally, the Summary Order instructed the Court to consider plaintiff's request for the entry of judgment on an award of post-judgment interest. [Rec. Doc. 149, at 4]. Pursuant to the Second Circuit's directive, this Ruling will address and resolve only the issues set out above.

## II. FRAUD CLAIM

The plaintiffs brought a claim of common law fraud under New York law premised on their allegation that they executed the Lease in reliance on the defendants' representations that

---

[3] The plaintiffs also appealed the Court's post-trial February 2, 2011 Order denying plaintiffs' Motion to Alter Judgment. [Rec. Doc. 145].

[4] The Second Circuit determined that the Court's Judgment did not award separate damages under Count 2 (Navigation Law) because the Court awarded damages for the same remediation costs under Count 3 (common law fraud). Recovery for the plaintiffs' Navigation Law claim, unlike recovery for their common law fraud claim, was capped at $100,000.00 **by** the terms of the Lease. [Rec. Doc. 149, at 4].

they had no knowledge of petroleum bulk storage tanks underground at the Site. *Amended Complaint* [Rec. Doc. 7, ¶¶ 122-36]. As established by the evidence adduced at trial, the plaintiffs discovered storage tanks buried underground at the Site in December 2001, approximately nine months after executing the Lease with the defendants. (Tr. 574:12–14.) After trial, the Court found that the plaintiffs proved all five elements of fraud against the defendants by clear and convincing evidence. *Oral Ruling* [Rec. Doc. 147, at 28]. Of the five factual findings made by the Court to sustain the fraud claim, the Second Circuit determined that the Court "clearly erred" in making two of those findings: number two (2), that Raphy made or caused to be made the "Trinity Affidavit," and number three (3), that Raphy faxed that affidavit to Camin Cargo Control, Inc. (Camin). [Rec. Doc. 149, at 3]. The appellate court found no error in the Court's three other factual findings underlying its ruling in favor of plaintiffs as to the fraud claim. [Rec. Doc. 149, at 3].[5] The Second Circuit vacated judgment on the fraud claim as a result of the two findings of clear error and remanded that claim to the Court for the "limited purpose of deciding, solely on the basis of the existing trial record and without reliance on the two findings . . . set aside, whether Defendants acted with reckless disregard for the truth." [Rec. Doc. 149, at 3].

One way for a plaintiff to prove fraud under New York law is by showing, by clear and convincing evidence, that the defendant "recklessly misrepresented a material fact." *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). As stated by the

---

[5] The findings with which the Second Circuit found no error were (1) that the Trinity Affidavit was a forgery; (4) that Camin relied on the forged Trinity Affidavit to prepare the Tank Closure Report; and (5) that Raphy made inconsistent statements regarding his involvement with underground storage tank removal. [Rec. Doc. 149, at 3].

Second Circuit, reckless conduct is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Stephenson v. PricewaterhouseCoopers, LLP*, 482 Fed. App'x 618, 623 (2d Cir. 2012) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (internal quotations omitted).

The clear and convincing standard of proof requires evidence "indicating that the thing to be proved is highly probable or reasonably certain." *Ragbir v. Holder*, 389 Fed. App'x 80, 84-85 (2d Cir. 2010) (internal citation omitted). Consequently, fraud may not be "assumed on doubtful evidence or circumstances of mere suspicion." *Barkley v. United Homes, LLC*, 2012 WL 2357295, slip op. at 10 (E.D.N.Y. June 20, 2012) (internal citations and quotations omitted). However, clear and convincing evidence may be circumstantial. *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 Fed. App'x 496 (2d Cir. 2009). This reflects the reality that "evidence of fraud is rarely susceptible of direct proof and must ordinarily be established by circumstantial evidence and the legitimate inferences arising therefrom." *Grand Union Mount Kisco Employees Fed. Credit Union v. Kanaryk*, 848 F. Supp. 446, 455 (S.D.N.Y. 1994) (quoting *Goshen Litho, Inc. v. Kohls*, 582 F. Supp. 1561, 1564 (S.D.N.Y. 1983)).

The trial record[6] reveals that Raphy represented to Clarke, both verbally during the Lease

---

[6] For a transcript of the trial, see Rec. Docs. 110, 111, 112, 113, and 115.

negotiations and in the Lease itself, that all underground petroleum bulk storage tanks were removed from the Site and that he had no knowledge of additional storage tanks buried on the property at the time of the Lease's execution on March 21, 2001. Clarke testified that Raphy told him prior to signing the Lease that "everything was removed" and that he was "willing to represent [that fact] in the lease." (Tr. 635:4–6.) Article 11 of the executed Lease stated that "Landlord represents that he has no knowledge either constructive or actual of any facts or conditions that would prevent the Tenant from using the Premises in accord with the terms of this Lease, or prevent or delay . . . construction of the improvements to the premises contemplated by the parties." (Joint Ex. 1, p. 29). Article 11(A) further stated that "Landlord represents that it has no knowledge of the presence of 'hazardous material' on or beneath the Premises." (Joint Ex. 1, p. 29).[7] In Article 11(A)(1), the Lease stated that Raphy's representation on this point was based upon a Phase I Environmental Study by Camin dated June 19, 1997 (Camin Report), obtained by Raphy and annexed to the Lease as Exhibit C. (Joint Ex. 1, p. 29). The article also stated that the "Landlord has not received any notices or has any knowledge of the existence of any 'hazardous material' at the premises." (Joint Ex. 1, p. 29).

The Court finds, based on the evidence contained in the trial record set out below, that the plaintiffs proved by clear and convincing evidence that the defendants acted with reckless disregard for the truth in representing to the plaintiffs, both verbally and in the Lease, that the underground storage tanks at the Site had been entirely removed and were no longer present at

---

[7] As defined by the Lease, the term 'hazardous material' means "any hazardous or toxic substance, material or waste which is regulated by any local governmental authority, or the State of New York or the United States Government." (Joint Ex. 1, p. 29). The tanks at issue in this litigation stored petroleum, a substance regulated by the state of New York.

the time of the execution of the Lease. The Court's review of the trial record on remand confirms, and in fact strengthens, the finding originally made in its October 19, 2011 oral ruling that Raphy's testimony during the trial was riddled with inconsistencies and not credible. [Rec. Doc. 147, at 4].[8]

Based on Raphy's testimony, he was not in a position to verify that all of the tanks that existed at the Site were removed because he left the Site during the removal before the job was completed. Raphy testified that he received a call from the company moving the tanks, so he drove to the Site and "saw a couple of tractors working and there were a few gas tanks above ground on the side." (Tr. 59:1–5.) He acknowledged that the company was "taking" the tanks, but stated that he was "there for a few minutes" and then "went back to work" at another location because he could not remain at the Site to watch. (Tr. 59:6–7.) When asked by the Court whether he stayed long enough to ensure the company completed the entire job and removed all of the tanks, Raphy testified that he did not, "[b]ecause it doesn't take that, it's 1, 2, 3." (Tr. 59:16–17.) Although Raphy did not remember at trial the date the tanks were actually removed, (Tr. 59:19–20), the record contains no evidence that Raphy made any attempt to follow up with the tank removal company after the day he saw them at the Site to ensure the job was complete. Raphy therefore, by his own admission, could not verify through his own personal knowledge that all of the tanks were removed from the Site.

Raphy's attempts at trial to distance himself from the Camin Report stand in stark contrast to the other evidence in the case, and the Court finds his repeated denials on this point

---

[8] In its October 19, 2010 oral ruling, the Court "found [Raphy's] testimony riddled with inconsistencies and not credible." [Rec. Doc. 147, at 4].

entirely incredible. The introduction to the Camin Report stated that "[o]n November 7, 1989, ten 550 gallon and one 4,000 gallon gasoline tanks . . . had been removed" from the Site. (Pl. Ex. 2, p. 3). The Camin Report's Technical Overview stated that "[t]ank removal operations were initiated and completed on November 7, 1989, by Trinity Petroleum Systems" and that "[a]ll tanks were removed to a salvage yard for disposal" after cleaning and inspection. (Pl. Ex. 2, p. 4). The Camin Report concluded that "no further [remedial] action" was necessary at the Site. (Pl. Ex. 2, p. 6). Raphy testified that he never read the Camin Report and never verified its accuracy because he did not "understand anything" in it. (Tr. 49:8–16.) When asked if he read the Camin Report's Technical Overview, Raphy responded that he "[n]ever read anything" from the Camin Report. (Tr. 51:1–6.) He later testified that he "never saw" the Camin Report. (Tr. 57:10–12.) Beyond claiming not to have ever seen the Camin Report, Raphy also stated that he never gave Camin any information on which it relied to issue the Report. (Tr. 52:3–10.)

Clarke, however, testified that he understood from the parties' negotiations and the Lease itself that both the landlord and the tenant were relying on the validity of the Camin Report. (Tr. 554:6.) This explains the Lease's explicit statement that Raphy's representation regarding the absence of hazardous material beneath the premises of the Site was "based upon" the Camin Report. (Joint Ex. 1, p. 29). The Camin Report, as noted in Article 11(A)(1) of the Lease, was annexed to the Lease as Exhibit C, and incorporated into the terms of the Lease. (Joint Ex. 1, p. 29). The Court finds Raphy's assertions that he never saw, read, or understood the Camin Report, which was annexed to the Lease he executed in March 2001, and which was referenced specifically in the Lease as the basis for his representation that no tanks were in the ground, completely incredible. Raphy's statements to the contrary notwithstanding, the Court does not

give credence to the assertion by a sophisticated real estate businessman that he did not read or understand the contents of an environmental report central to the future of his property.

As the Court has rejected Raphy's disingenuous, self-serving denials about the Camin Report, the Court places weight on two statements in the Report that bolster the conclusion that Raphy, at a minimum, acted in reckless disregard of the truth as related to the presence of underground storage tanks at the Site. In the Technical Overview, the Camin Report stated that "[t]ank removal operations were initiated and completed on November 7, 1989, by Trinity Petroleum Systems, a tank Contractor experienced in the removal of underground storage tanks." (Pl. Ex. 2, p. 4.) At trial, an exhibit was admitted that purported to be the affidavit of Reid Turoff, an employee of Trinity, stating that "on November 7, 1989 Trinity Petroleum Systems, Inc., under my [Turoff's] supervision and direction removed eleven (11) underground storage tanks from 175-14 Horace Harding Expressway." (Pl. Ex. 3). Based on Turoff's testimony regarding his unfamiliarity with the Site and the irregularities with the affidavit's signature, format, and notarization, the Court concluded in its October 19, 2010 oral ruling that the affidavit was a forgery. [Rec. Doc. 147, at 10].[9] Regardless of the identity of the forger and of the party responsible for transmitting the forged affidavit to Camin, the mere mention of Trinity in the Camin Report should have aroused Raphy's suspicion, because, as he testified at trial, he did not know the name of Trinity Petroleum and claimed never to have used them for anything. (Tr. 115:15–21). Although Raphy's assertions as to who was in charge of tank removal at the Site in 1989 flip-flopped extensively over time as discussed *infra*, he did not ever claim that Trinity was

---

[9] The Second Circuit affirmed this factual finding, although it vacated the Court's additional findings that "Raphy 'made or caused to be made' the Trinity Affidavit" and that "Raphy faxed the Trinity Affidavit to Camin Cargo, Inc." [Rec. Doc. 149, at 3].

responsible for removal of the thanks. The Camin Report that incorporated Trinity's name as the company responsible for tank removal should have put Raphy on notice that Camin's record of the tank removal in 1989 was, at a minimum, at least in part, inaccurate.

A second statement in the Camin Report likewise should have aroused Raphy's suspicion and therefore put him on notice of the incomplete nature of the 1989 removal job. As part of the preparatory work for drafting the Camin Report, environmental analysts at Camin drilled at the Site in 1997 to test the soil for possible petroleum contamination. (Pl. Ex. 2, p. 4.) As testified to by Patricia Badding, a Camin employee who helped prepare the Report, a third-party involved in the tank closure business pointed out to her where the underground storage tank field at the Site had been located so that she could proceed with Camin's drilling work. (Tr. 207:9–10.) The Camin Report notes that during the drilling, "[r]efusal was met on the eastern side of where the 4,000 gallon tank had been located." (Pl. Ex. 2, p. 5). As Clarke explained, the term "refusal" as used in the Camin Report meant that the drill "wouldn't go into the ground" because of some obstruction under the surface. (Tr. 581:5–8). The Camin Report speculated that "[s]ince the tanks were situated on concrete slabs, it is probable refusal was encountered as a result of this concrete." (Pl. Ex. 2, p. 5.)

The President of GC Environmental, Inc., Greg Collins, conducted an analysis after the tanks' eventual removal from the Site in 2002, and testified that "[t]ypically" tanks below the surface "are encased in concrete," as evidenced by the condition of the tanks discovered in 2001. (Tr. 278:24–279:3.) For tanks previously removed, however, only a "mold[] of the tanks, kind of like a fox hole," would exist under the ground after the tank was extracted, rather than a complete concrete encasement. (Tr. 278:24–279:3.) As Collins explained, tanks stored in the

ground are sealed up in a concrete box called a "vault" to protect the tanks (Tr. 296:18–22), and at the time of the 2002 removal, he found that part of the tank vault had been broken at an earlier time to remove some, but not all, of the tanks from the vault. (Tr. 309.23–310.1.) If all of the tanks had been removed in 1989, the concrete encasements in which the tanks were stored would not have been intact below the soil in 2002, but instead would have resembled only a mold or shell of the former encasement. When the removal job was completed in 2002, the 4,000 gallon tank was found in the same area where the original maps of the Site located it (Pl. Ex. 11), and the same area where the Camin analyst recorded the refusal and noted the likely presence of concrete below the surface. (Tr. 277:2–7; 280:24–25; 283:4–9.) Camin's encounter with concrete below the surface during the 1997 drilling and its notation of the refusal in its Report put Raphy on notice regarding the suspicious presence of intact concrete in the area where some of the tanks had previously been removed, as removed tanks left only an "impression[]," but not a hard concrete cover. (Tr. 309:15–16.)

Raphy's actions following the discovery of the underground tanks in December 2001 offer additional circumstantial evidence that he recklessly disregarded the truth of the tanks' presence and in fact belie the notion that he did not know that all of the tanks had not been removed twelve years earlier. Clarke testified that he contacted Raphy upon discovery of the tanks, met him at the Site where the tanks were fully viewable in the ground, and that Raphy saw the tanks still buried in the ground. (Tr. 125:7–21.) After viewing the tanks, Clarke stated that Raphy "stayed there a few minutes and turned around and walked away without saying good-bye." (Tr. 125:8–10.) The two had "no substantive conversation[]" at the Site after seeing the tanks being excavated. (Tr. 608:24–609:1.) Although he harbored suspicions regarding Raphy's

11

knowledge of the problem based on his initial reaction at the Site, Clarke subsequently scheduled a meeting with Raphy and an attorney to discuss commencing litigation against Camin for issuing the erroneous report. (Tr. 143:5–17.) Clarke offered to front the cost of initiating the lawsuit. (Tr. 144:16–24.) Raphy never opted to join in the lawsuit, (Tr. 108:17–19), although by the terms of the Lease the financial responsibility for remediation after discovery of any hazardous material fell on his shoulders as the landlord. (Joint Ex. 1, p. 30).[10] Moreover, although Clarke and Raphy met in person a number of times following the discovery of the tanks, Clarke testified that Raphy never expressed his surprise at the discovery of the tanks nor questioned the enormous error made by Camin in its Report. (Tr. 155:7–14.) At trial, Raphy claimed that he did not remember any conversations with Clarke regarding bringing a lawsuit against Camin over the Report, nor did he remember that Clarke offered to advance the costs of the suit up front. (Tr. 107:7–108:10.)

The Court also finds Raphy not to be credible in his assertions about his knowledge of the tanks due to significant discrepancies in a number of Raphy's statements in various fora regarding the party in charge of the removal of the tanks in 1989. During a Community Board hearing on October 19, 1991, a recording of which was admitted as Plaintiff's Exhibit 38 and played at the trial, Raphy stated that the tanks had been removed by someone other than him and that he did not remove them. (Pl. Ex. 38). Raphy acknowledged at trial that he took this position in 1991. (Tr. 22:1–5.) During a May 26, 2004 deposition in a separate civil suit related to this

---

[10] The Lease stated that "[i]f hazardous material, hazardous waste or hazardous substances are found to exist at the Premises, as the result of [assessments the tenant had the right to conduct], *or when Tenant commences its construction and excavation of the premises*, Landlord agrees to expeditiously remedy the condition." (Joint Ex. 1, p. 30) (emphasis added).

Site, Raphy stated that he himself hired the company to remove the tanks. (Tr. 34:10–20.) When confronted at trial with the conflicting positions he had previously taken, Raphy reverted to the account given in 1991 during the Community Board hearing, stating that the correct version of what happened was that another company, Fast Lube, had been in charge of the removal operation in 1989. (Tr. 35:2–15.) To explain the difference between his two contrasting positions, Raphy could only surmise that when he gave his answer under oath during his 2004 deposition, he could not remember at that time what had been done in 1989. (Tr. 35:16–23.) Six years later at the trial conducted in this proceeding in 2010, however, Raphy clearly asserted that it happened the way he had originally stated in 1991: that another company had been in charge of the tank removal in 1989, (Tr. 35:10–23), and that he "never was involved." (Tr. 43:21.) According to Raphy's testimony at trial, while his memory of 1989 was clear, his memory of the substance of an event occurring some fifteen years *later*—his 2004 deposition in which he testified he had hired the removal company—was murky. (Tr. 29:11.)

Raphy's vacillation on this key point is further evidenced by a ruling from an administrative law judge with the state Department of Environmental Conservation (DEC) who presided over the November 2005 litigation of the defendants' violations of New York's petroleum bulk storage regulations for the tanks removed in 1989 and in 2002. In the 2005 decision, a copy of which was admitted at trial, the DEC ALJ noted that the respondents to that action—the same parties as the defendants here—took the position that the "tanks were removed at their direction by a contractor who had the knowledge and experience to remove such tanks in the manner prescribed by the regulations." (Pl. Ex. 25, p. 10). John Urda, an attorney for the DEC who prosecuted the action, confirmed during his testimony at trial that the defendants took

the position in front of the DEC that they themselves took responsibility for and arranged the removal of the tanks in 1989. (Tr. 363:5–20.) When Raphy was asked if this was the position he took in the 2005 DEC proceedings, he denied that he took such a position, and responded that he "never was involved" in the removal. (Tr. 43:21.) However, his counsel quickly stipulated that "whatever position is stated in [the 2005 DEC decision] is the position that Raphy Benaim took" during the 2005 DEC proceedings. (Tr. 44:14–17.)

Contrary to both the statements in his 2004 deposition and to the position he asserted in the 2005 DEC proceeding, Raphy testified several times during the trial in 2010 that another company, Fast Lube, either took care of removing the tanks or was in charge of paying a contractor who removed the tanks in 1989. (Tr. 51:8–18) (removal); (Tr. 59:8–13) (paying another company for removal). Even when confronted with his own prior contradictory assertions made under oath, Raphy firmly asserted at trial that he had "[n]othing to do with [the tanks]" and that Fast Lube took care of everything. (Tr. 115:17–23.) Raphy's accounts of who removed the tanks in 1989–which have shifted no less than three times since 1991, even when under oath–entirely vitiate his credibility as to his knowledge of the 1989 removal.

The Court finds the position taken by Raphy in the 2005 DEC proceeding damaging to his credibility for an additional, related reason. As set out above, the DEC brought an enforcement action in 2005 against the defendants for violations of state regulations pertaining to petroleum bulk tank storage at the Site. (Pl. Ex. 25).[11] The DEC brought two counts for each violation because it believed the Site contained two separate sets of underground storage tanks:

---

[11] Among other violations, the DEC alleged that the removals violated state regulations by failing to register the tanks with the DEC, failing to notify the DEC of substantial modifications of the gas station facility, failing to test the storage tanks, and failing to keep inventory records on the tanks. (Pl. Ex. 25, p. 8-9).

one set of tanks which was removed in 1989, causing a number of violations; and one set which was removed in 2002, causing another round of the same violations. (Pl. Ex. 25, p. 8). During the proceeding, as described by the ALJ, the defendants attempted to escape liability for the 2002 removal by claiming that they "had no knowledge of the second set of tanks and that they removed the first set within a year of acquiring the property [in 1989]." (Pl. Ex. 25, p. 10). Essentially, the defendants claimed, "in 1989, to their knowledge, they had *all tanks* removed." (Pl. Ex. 25, p. 8) (emphasis added). Repeatedly in the ruling, the ALJ acknowledges the defendants' claim to "have not known of the existence of the second set of tanks until a tenant," Clarke, "discovered them" in 2001. (Pl. Ex. 25, p. 12). The defendants strategy was to shift responsibility for all the alleged violations related to the "second set" of tanks removed in 2002 to Clarke. (Pl. Ex. 25, p. 10-11) (noting that the defendants wanted "the Department to recognize its lease agreement with its tenants which places responsibility for clean up and any penalties on that tenant"). Urda, the attorney for the DEC, confirmed at trial in 2010 that the defendants took the position in 2005 that all eleven tanks had been removed in 1989. (Tr. 351:17–21.)

The Court finds that the position taken by the defendants in the 2005 DEC proceeding to be entirely implausible. As set out above, the vault containing all of the tanks was in the same location as the location on the Site depicted in both the pre-1997 plans of the Site and in the Camin Report. (Tr. 283:10.) Greg Collins testified that the vault from which the remaining tanks were removed from the Site in 2002 contained impressions of additional tanks previously removed from within the vault. (Tr. 309:23–310:1.) To square the defendants' 2005 DEC position that "all" eleven tanks were removed in 1989 with the undisputed fact that seven tanks

were subsequently discovered in the *same* area in late 2001 and removed in 2002, the *only* explanation is that petroleum bulk storage tanks were installed underground in that location between the years 1989 and 2001. Without such an installation in the interim, the claim of complete removal in 1989, and the fact of discovery of underground tanks in 2001, cannot be reconciled. The Court finds it inconceivable that such an installation could have occurred on property the defendants owned throughout the period of 1989 to 2001 without their knowledge. Rather, the Court finds the more likely explanation, based on the trial record and its credibility determinations, to be that the defendants adopted a disingenuous position in front of the DEC in their affirmative assurances of complete removal of all eleven tanks. This explanation is supported by the defendants' attempts to pin liability for the violations from the 2002 removal on the tenant Clarke, who began leasing the property mere months before the tanks' discovery at the Site.

Taken together, the evidence in the record and the inferences therefrom lead the Court to conclude that the plaintiffs proved, by clear and convincing evidence, that Raphy acted, at a bare minimum, in reckless disregard of the truth in his representations to plaintiffs that all the underground storage tanks had been removed and that he had no knowledge of any hazardous materials under the ground, and that he therefore committed a fraud on the plaintiffs under New York state law. As there is sufficient evidence to sustain a judgment for fraud, the Court will reinstate the award on plaintiff's fraud claim in the sum of $170,525.00.

## III. NAVIGATION LAW CLAIM

As a result of the foregoing, the Court will make no award under Count 2, plaintiffs'

Navigation Law claim on which they prevailed at trial, as compensation for that claim is subsumed by the Court's award on Count 3 (common law fraud).

## IV. POST-JUDGMENT INTEREST

The Court will award post-judgment interest to the plaintiffs. The Second Circuit's Summary Order instructed the Court to consider the issue of post-judgment interest while on remand pursuant to the plaintiffs' request. [Rec. 149, p. 4-5]. In the plaintiffs' appellate brief, they sought "a direction to the trial court to issue a supplementary judgment for the interest that was ordered to be paid by the trial court's December 14, 2010 order." Brief for Plaintiffs-Appellees-Cross-Appellants at 29, *Fresh Meadow Food Services, LLC v. RB 175 Corp.*, 2012 WL 5476659 (2d Cir. 2012) (No. 10-4661).

As part of its original October 19, 2010 Judgment, the Court ordered that "post-judgment interest on the total award of $335,347 plus accrued interest through the date of entry of this judgment, shall accrue at the rate provided for by Title 28, United States Code, § 1961, from the date of entry of judgment until paid." [Rec. Doc. 114, at 2-3].[12] The Court subsequently recognized in its December 14, 2010 Order that the parties stipulated that the "accrued interest" through the date of judgment totaled $189,847.84. *Order* [Rec. Doc. 137]. The Court further recognized in its December 14, 2010 Order that the parties stipulated that the "interest after the Court's October 19, 2010 Judgment accrues at a rate of .22% per annum or a per diem interest amount of $3.17 pursuant to Title 28, United States Code, § 1961." [Rec. Doc. 137]. The docket sheet reflects that the Court did not enter a Judgment following its December 14, 2010 Order.

The plaintiffs thereafter filed a letter detailing the difficulties they had enforcing the

---

[12] *See supra* n.2.

interest award in state court, as the Court's December 14 entry was styled an 'Order' rather than a 'Judgment.' *Letter* [Rec. Doc. 140]. To remedy this problem, the plaintiffs sought, and received, permission from the Court on January 10, 2011 to submit a Proposed Amended Money Judgment (Proposed Judgment). *Order* [Rec. Doc. 141]. The purpose of the Proposed Judgment, styled on the docket sheet as a "Motion to Alter Judgment," was to consolidate the Court's several awards on compensatory damages, attorneys' fees,[13] and interest into a single judgment to enforce those awards. [Rec. Doc. 140]. The paragraph of the plaintiffs' Proposed Judgment relevant to the interest award suggested that the Court order

> that post-judgment interest on the total award of $526,194.84 representing the aggregate damages awarded [$336,347.00] plus interest through October 19, 2010 (but not attorneys' fees) [$189,847.84], shall bear interest at a rate of .22% per annum or $3.17 per diem, pursuant to Title 28 U.S.C. § 1961, on and after October 20, 2010 until paid, subject to change in rate and per diem pursuant to Title 28 U.S.C. § 1961.

*Proposed Judgment* [Rec. Doc. 142]. The plaintiffs' Proposed Judgment also suggested that the Court order "that Plaintiffs are awarded interest upon the amount of attorneys' fees awarded ($190,000) commencing on December 21, 2010 and shall bear interest at a rate of .22% per annum or $3.17 per diem, pursuant to Title 28 U.S.C. § 1961, and after December 21, 2010 until paid." [Rec. Doc. 142]. Although it was the Court's intention to grant plaintiffs post-judgment interest, as evidenced by its October 19, 2010 Judgment [Rec. Doc. 114] and its December 14, 2010 Order [Rec. Doc. 137], the Court did not enter the judgment as requested by the plaintiffs, but rather denied the Motion to Alter Judgment, as the Court was of the view that it had been

---

[13] In addition to the Court's October 19, 2010 Judgment and December 14, 2010 Order, on December 21, 2010, the Court entered Judgment awarding the plaintiffs $190,000.00 in attorneys' fees on Count 4 (breach of lease agreement) pursuant to the parties' joint stipulation to that amount. *Judgment* [Rec. Doc. 139].

divested of control over the issues as a result of the parties' filing notices of appeal. *Order* [Rec. Doc. 144].

As set out above, on remand, the Court was granted jurisdiction by the Circuit Court to consider the issue of post-judgment interest. [Rec. Doc. 149, at 5]. "Postjudgment interest is designed to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment." *Andrulonis v. United States*, 26 F.3d 1224, 1230 (2d Cir. 1994). After a review of the docket filings and the plaintiffs' requests, the Court will enter an award of post-judgment interest as part of the judgment that will issue in accordance with this Ruling. The Court's present intention is to issue its judgment on Friday, March 1, 2013. The award of post-judgment interest will be divided into four parts as set out below.

**A. Post-Judgment Interest on the Court's Award as to Count 4 (breach of lease agreement)**

The award on Count 4 (breach of lease agreement) in the amount of $165,822.00 shall bear interest at a rate of 0.22% per annum,[14] pursuant to Title 28 U.S.C. § 1961, on and after October 19, 2010 until paid. Although the plaintiffs' Proposed Judgment suggests "on and after October 20, 2010 until paid," [Rec. Doc. 142, at 2], October 19 is the proper commencement date because section 1961 clearly states that post-judgment interest "shall be calculated from the date *of the entry of the judgment*" and not the day after such entry. 28 U.S.C. § 1961(a) (emphasis

---

[14] Pursuant to section 1961(a), post-judgment "interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding" the date of the judgment. 28 U.S.C. § 1961(a). The weekly average one-year constant maturity treasury yield for the week ending October 15, 2010 was 0.22%. *See* Post-Judgment Interest Rates, http://www.utd.uscourts.gov/documents/int2010.html. The parties agreed to 0.22% as the applicable rate within their joint stipulation on the amount of interest owed to the plaintiffs. *Supplemental Affidavit* [Rec. Doc. 129, at 4].

added); *see also Magee v. U.S. Lines, Inc.*, 976 F.2d 821, 824 (2d Cir. 1992) (directing that "postjudgment interest be computed as of the actual date of judgment entry").

**B. Post-Judgment Interest on the Court's Award as to Count 3 (common law fraud)**

The award on Count 3 (common law fraud) in the sum of $170,525.00, that will be reinstated by the judgment that will issue based on this Ruling, shall bear post-judgment interest at a rate equal to the weekly average 1-year constant maturity Treasury yield for the calendar week preceding March 1, 2013, on and after March 1 until paid. For the reasons set forth below, as a result of the Second Circuit's vacatur of the Court's Judgment as to Count 3 (common law fraud) [Rec. Doc. 149], the per annum rate that will be used to calculate the post-judgment interest on Count 3 will not likely be 0.22%, the rate applicable to the Court's October 19, 2010 Judgment, even though the fraud award will be reinstated for the same principal amount.

The Second Circuit has held that "'post-judgment interest commences from the date a judgment is ascertained in a meaningful way' and 'supported by the evidence.'" *Goodrich Corp. v. Town of Middlebury*, 311 F.3d 154, 178 (2d Cir. 2002) (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 55 (2d Cir. 1998)). Determination of this date is critical because "this is the date that separates for the computation of interest the pre-judgment and post-judgment periods." *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 103 (2d Cir. 2004).[15] In cases with multiple judgments, "post-judgment interest should be calculated from whenever judgment was *first ascertained* in a meaningful way." *Id.* at 104 (citing *Goodrich Corp.*, 311 F.3d at 178, and

---

[15] *See also NML Capital v. Republic of Arg.*, 435 Fed. App'x 41, 43 (2d Cir. 2011) ("In general, pre-judgment interest ceases to accrue, and post-judgment interest begins to accrue, as of the date that judgment first 'is ascertained in a meaningful way and supported by the evidence.'") (quoting *Adrian v. Town of Yorktown*, 620 F.3d 104, 107 (2d Cir. 2010)).

*Greenway*, 143 F.3d at 55) (emphasis added). However, if a judgment on damages "finds no support in the evidence, it may not be said that damages have been ascertained in a meaningful way." *Id.* (citing *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 836 (1990)).

In cases where the parties appeal and the appellate court remands, the inquiry into when judgment was first ascertained in a meaningful way is dependant on the precise nature of the remand order. "Where a judgment is vacated [on appeal] 'because it lacks a legal basis or requires further factual development, the vacated award should be treated as a nullity and post-judgment interest therefore accrues from the entry of judgment on remand.'" *Id.* (quoting *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996)). Where, however, "the original judgment is basically sound but is modified on remand, post-judgment interest accrues from the date of the first judgment." *Lewis*, 99 F.3d at 545 (quoting *Cordero v. De Jesus-Mendez*, 922 F.2d 11, 16 (1st Cir. 1990)).

The Court concludes that although the result of the judgment that will issue based on this Ruling will be for the same sum as that of the Court's October 19, 2010 Judgment—i.e., the sum of $170,525.00 on plaintiffs' fraud claim—the Second Circuit's vacatur is equivalent to a determination that the Court's October 2010 Judgment was not "ascertained in a meaningful way and supported by the evidence." The vacatur of the fraud award due to clearly erroneous factual findings represents a determination that the Court's judgment "lack[ed] a legal basis." *See Lewis*, 99 F.3d at 545. The holdings of clear error as to two essential factual findings negates any contention that the original judgment was "basically sound . . . [and only] modified on remand." *See id.* Moreover, the Circuit Court's Summary Order's holdings differentiate this case from *Indu Craft, Inc. v. Bank of Baroda* and *Adrian v. Town of Yorktown*—two cases in which the

Second Circuit held previously that post-judgment interest ran from the date of the first judgment—and render them inapposite here.[16]  The Court finds the rationale applied in *Natural Organics, Inc. v. Nutraceutical Corp.*, 2009 WL 2424188 (S.D.N.Y. Aug. 6, 2009), a case with analogous facts, highly persuasive.[17]

The judgment that will issue pursuant to this Ruling will award post-judgment interest on the fraud award from March 1, 2013, the date that judgment will be entered.  Under section 1961, the interest rate to be applied will be equivalent to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding March 1, 2013.

---

[16]  In *Indu Craft*, the trial court entered judgment in 1992 in favor of the plaintiff after a jury verdict, but subsequently reversed course and granted the defendants' post-trial motion for judgment as a matter of law. 87 F.3d 614, 616 (2d Cir. 1996).  The Second Circuit reversed the district court and directed the plaintiff's verdict be reinstated.  *Id.*  The trial court entered judgment in 1995 in compliance with the Second Circuit's ruling. *Id.* at 617. In holding that the post-judgment interest ran from the date of the trial court's original 1992 judgment, the Second Circuit noted that it had not "disturb[ed] the jury's factual findings on appeal" and instead found that "the original judgment was sufficiently substantiated by the evidence." *Id.* at 620. The appellate court's reversal of the district court did not "change the fact that the judgment was ascertained in a meaningful sense on August 21, 1992, the date on which the original judgment was entered following the jury verdict." *Id.* In *Adrian*, the Court found the case in the "exact procedural posture" as *Indu Craft*, and held that post-judgment interest ran from the date of the original judgment based on *Indu Craft*'s "clear answer" to the question of the controlling date in a case with such a procedural posture. 620 F.3d at 107-08.

[17]  In *Natural Organics*, the Second Circuit vacated and remanded the case to the district court after "finding that the trial court failed to expressly consider each [relevant] factor" before reaching its conclusion.  2009 WL 2424188, at *12.  On remand, the district court ruled the same way after complying with the appellate court's order and expressly considering each factor in the analysis based on the completed record. *Id.* at *1. The Second Circuit then affirmed the district court's second judgment. *Id.* In reviewing the subsequent motions for post-judgment interest, the district court noted that there was merit to the defendants' argument "that in this instance the original judgment was entered based on substantial evidence presented to the trial court, was basically sound and merely modified upon vacatur and remand, and therefore judgment was ascertained in a meaningful way such that postjudgment interest should run from that [original judgment] date." *Id.* at *12.  Ultimately, however, the district court rejected this argument, reasoning that the Second Circuit instructed the lower court that the "factor that the district court relied on in its [original] Opinion was not dispositive," and interpreted the appellate court's instruction "to mean that the original Opinion could not have been a judgment ascertained in a meaningful way." *Id.*

### C. Post-Judgment Interest on the Court's Award as to Accrued Interest

#### 1. Post-judgment Interest on the Accrued Interest as to Count 4 (breach of lease agreement)

The total value of the accrued interest on the $165,822.00 awarded on Count 4 (breach of lease agreement) is $130,809.17 through the date of the Court's original judgment, October 19, 2010, as stipulated by the parties. [Rec. Doc. 129]. The $130,809.17 of accrued interest shall bear post-judgment interest at a rate of .22% per annum pursuant to section 1961, on and after October 19, 2010 until paid.

#### 2. Post-judgment Interest on the Accrued Interest as to Count 3 (common law fraud)

The parties stipulated that the total pre-judgment interest on the $170,525.00 awarded by the Court on Count 3 (common law fraud) was $123,038.67 as of October 19, 2010. [Rec. Doc. 129]. The stipulated amount is no longer accurate or valid, as the date that post-judgment interest will commence—i.e., the date that the judgment is ascertained in a 'meaningful way,' *Goodrich Corp.*, 311 F.3d at 178—is also the date on which the pre-judgment interest ceases to accrue. *See Adrian*, 620 F.3d at 107-08; *Westinghouse*, 371 F.3d at 103. Therefore, pre-judgment interest will accrue on the fraud award (Count 3 Interest) until the date the Court issues its judgment pursuant to this Ruling, and post-judgment interest will commence on that date and will continue to accrue thereafter until paid.

The attorneys of record for the parties are therefore instructed to file via ECF, on or before 5:00 p.m. EST on Monday, February 25, 2013, a joint stipulation of the pre-judgment interest due under the Court's award of $170,525.00 on Count 3 through March 1, 2013, the date the Court presently intends to enter the judgment that will issue in accordance with this Ruling.

The attorneys' submittal is to be calculated in the same manner and in the same format as they used in Exhibit A to the Supplemental Affidavit. [Rec. Doc. 129]. The joint stipulation should include a schedule breaking down the calculation of the sum of the accrued interest as an attached exhibit.

The stipulated amount submitted by the attorneys pursuant to this Ruling shall bear post-judgment interest at the rate specified by section 1961 for the calendar week preceding March 1, 2013, accruing on and after March 1 until paid. The Court will incorporate the stipulated-to amount of interest and will order the accrual of post-judgment interest on that amount at the proper rate in the judgment that will be entered.

### 3. Offsetting Credit on the Pre-Judgment Interest Total

The Court recognizes that the parties stipulated on November 19, 2010 that the defendants had previously paid several installments to plaintiffs, totaling $64,000.00, that the parties intended to be applied against the total accrued pre-judgment interest on the amounts awarded under Counts 3 and 4 before application of the post-judgment interest rate to the total accrued interest. [Rec. Doc. 129]. This calculation was premised on the parties' belief, correct at the time, that the post-judgment interest on both the Count 3 and Count 4 awards would begin to accrue on October 19, 2010. The attorneys are therefore instructed to include in their joint stipulation their agreement as to the application of the $64,000.00 credit that defendants previously paid to plaintiff. In the event that the parties cannot stipulate as to the application of the credit, the Court will simply note in its judgment that the defendants are due a credit of $64,000 against the total amount awarded by the judgment.

### D. Post-Judgment Interest on the Court's Award as to Attorney's Fees

Although the Court's October 19, 2010 Judgment awarded the plaintiffs attorneys' fees, the Court did not specifically award post-judgment interest on the attorneys' fees award. [Rec. Doc. 114]. The Court's December 21, 2010 Judgment setting the attorneys' fee award at $190,000.00 as stipulated by the parties likewise did not include an order for the accrual of post-judgment interest on the attorneys' fees. [Rec. Doc. 139]. It is clear, however, from the plaintiffs' Proposed Judgment that they believed they were entitled to post-judgment interest on the attorneys' fees award. [Rec. Doc. 142]. As the Court is considering the issue of post-judgment interest anew on remand, the Court will award post-judgment interest on the attorneys' fee award at the rate of 0.22%, accruing from October 19, 2010 until paid.

Where a judgment awards attorneys' fees, post-judgment interest shall accrue on the award for attorneys' fees pursuant to section 1961. *See, e.g.*, *Natural Organics*, 2009 WL 2424188, at *9-10 ("Entitlement to postjudgment interest extends to all money judgments, including awards of attorneys' fees and costs") (citing cases); *see also Raff v. Maggio*, 746 F. Supp. 1207, 1208 (E.D.N.Y. 1990) ("[T]his Court finds that plaintiff may receive interest on the attorneys' fees award where the judgment is inclusive of such an award."). It is an open question in the Second Circuit "whether § 1961 postjudgment interest should accrue from the date of judgment establishing the right to an award of attorneys' fees . . . or from the date of the judgment 'establishing its quantum.'" *See Natural Organics*, 2009 WL 2424188, at *10. The "majority approach" followed by the Fifth, Sixth, Eighth, Ninth, Eleventh, and Federal Circuits uses the date "the party becomes entitled to the award even if that award is not quantified until a later point." *Id.* (quoting *Albahary v. City & Town of New Bristol, Conn.*, 96 F. Supp. 2d 121,

122 (D. Conn. 2000)).  Many district courts from the Second Circuit,[18] and particularly from the Eastern District of New York,[19] have adopted the majority approach, which is now considered the "dominant standard within the Second Circuit." *Hubbard v. Total Commc'ns, Inc.*, 623 F. Supp. 2d 270, 272 (D. Conn. 2009).  This Court will likewise adopt the majority approach for the reasons set out in the cited opinions.

Here, the plaintiffs became entitled to the attorneys' fee award on October 19, 2010, the date of the Court's original Judgment.  Therefore, in the judgment that will issue, the Court will award post-judgment interest on the attorneys' fee award at the rate of 0.22%, accruing from October 19, 2010 until paid.

## V.  CONCLUSION

For the foregoing reasons, the $170,525.00 award on Count 3 (common law fraud) will be reinstated.  The Court will award post-judgment interest to the plaintiffs on (1) the award on Count 4 (breach of lease agreement); (2) the award on Count 3 (common law fraud); (3) the accrued interest on Count 4; (4) the accrued interest on Count 3; and (5) the attorneys' fee award. The Court will modify the amount of the pre-judgment interest originally awarded on Count 3, based on the stipulation that is to be submitted by the attorneys, as a result of its determination after remand that the proper date to begin calculating post-judgment interest is the date of entry of the judgment that will issue herein.  It is therefore

---

[18] *See, e.g., Natural Organics*, 2009 WL 242188, at *10; *Pappas v. Watson Wyatt & Co.*, 2008 WL 350633, at *3 (D. Conn. Feb. 7, 2008); *Albahary*, 96 F. Supp. 2d at 124.

[19] *See, e.g., Aiello* v. *Town of Brookhaven*, 2005 WL 1397202, at *9 (E.D.N.Y. June 13, 2005); *King v. JCS Enters. Co.*, 325 F. Supp. 2d 162, 175 (E.D.N.Y. 2004); *Nicholson v. Williams*, 2004 WL 4760138, at *3 (E.D.N.Y. Oct. 25, 2004).

**ORDERED** that the attorneys for the parties are to make a joint filing via ECF, on or before 5:00 p.m. EST on Monday, February 25, 2013, setting out the amount of pre-judgment interest that has accrued as to all of the individual costs that total the sum of $170,525.00, the amount of the award on Count 3, between the date of payment of those individual costs and March 1, 2013, the date on which the Court intends to enter its judgment.   It is further

**ORDERED** that the parties' joint filing set forth their agreement as to the application of the $64,000.00 credit for the payments previously made by the defendants to plaintiffs.

**SO ORDERED.**

Tucker L. Melançon
United States District Judge

February 11, 2013
Brooklyn, NY